UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| VICKI J. LOBBES, | ) | |
| Social Security No. XXX-XX-0556, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 4:13-cv-57-RLY-WGH |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO REMAND**

**Table of Contents**

I.   Background...............................................................................1

     A. Procedural History and Jurisdiction......................................1

     B. Lobbes's Conditions and Work History.................................2

     C. Lobbes's Burden of Proof and the ALJ's Five-Step Inquiry.................3

     D. The ALJ's Findings...........................................................4

II.  Standard of Review...................................................................5

III. Analysis....................................................................................6

     A. The ALJ erred by examining three GAF scores but ignoring eight
        others. .........................................................................6

        1. GAF scores may, but do not always, reflect a clinician's
           judgment as to the claimant's level of functioning. ...................7

2. An ALJ errs by ignoring evidence that would undermine his conclusion. ...............................................................................8

3. The Record includes eleven GAF scores, but the ALJ addressed only three. ..............................................................................9

4. The ALJ erred by examining some of Lobbes's GAF scores but ignoring others. ...................................................................10

    a. By choosing to consider GAF as evidence of Lobbes's RFC, the ALJ bound himself to consider every GAF score in the Record. ......................................................................11

    b. The ALJ's review of Lobbes's GAF scores was either incomplete or unreasoned. ...........................................12

    c. The ALJ's omissions were material. ..............................13

    d. The Record and controlling law bar the Commissioner's defenses on this issue. .................................................13

B. The ALJ failed to account for Lobbes's differences in productivity during manic and depressive phases when he framed his hypothetical questions to the VE. ........................................................................16

1. The ALJ adequately considered the differences between Lobbes's manic and depressive phases when determining her RFC. ......................................................................................17

2. The ALJ erred by failing to account for Lobbes's depressive phases when framing his hypothetical questions to the VE. ...19

    a. The ALJ obligated himself to orient the VE to all of Lobbes's limitations. ....................................................21

    b. The ALJ failed to orient the VE to Lobbes's diminished productivity during depressive phases. .........................22

C. The ALJ erred in evaluating third-party function reports from Karen Ricketts and Kim Humphries. ..........................................................25

D. The ALJ erred in considering Lobbes's participation in vocational rehabilitation. ................................................................................28

E.  The ALJ did not err in finding that Lobbes retained RFC to remain on task for an average of 95% of an 8-hour workday, but the ALJ's failure to explain that finding may warrant remand. ..................................31

1. The ALJ properly accounted for Lobbes's moderate limitation through reductions in both task complexity and productivity. 31

2. Equating a moderate limitation to a five percent reduction in functionality does not necessarily constitute legal error. ........32

3. Whether an ALJ errs in quantifying a claimant's limitations is a matter of evidence and reasoning—not his choice of numbers. ............................................................................35

4. The Magistrate questions the ALJ's explanation of Lobbes's ability to remain on task for 95% of a workday. .....................37

5. The Magistrate recommends that the Court affirm the ALJ's decision on this issue but instruct the Commissioner to more thoroughly explain his quantification of Lobbes's limitation on remand. ............................................................................38

IV.  Conclusion..............................................................................................39

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, pursuant to an order to deliver a report and recommendation. (Dkt. 24). Plaintiff Vicki Lobbes seeks judicial review of the final decision of the Social Security Administration, which found that she was not disabled and therefore not entitled to Disability Insurance Benefits or Supplemental Security Income ("benefits") under the Social Security Act. 42 U.S.C. § 301 *et seq.* The matter is fully briefed, and the Magistrate Judge, being duly advised, recommends **REMANDING** the case to the Administration.

## I. Background

In their briefs, the parties thoroughly recounted the facts underlying Lobbes's applications for benefits and the proceedings that have brought this matter before the Court. (*See* Dkt. 15; Dkt. 22; Dkt. 23). The Magistrate Judge revisits them here only as necessary to address the parties' arguments on judicial review.

### A. Procedural History and Jurisdiction

Lobbes applied for benefits on April 12, 2010, alleging an onset date of October 4, 2006. (R. at 133–43). The Administration denied Lobbes's applications on June 10, 2010 (R. at 74–75), and again upon reconsideration on July 20, 2010 (R. at 76–77). An Administrative Law Judge ("ALJ") heard Lobbes's applications on September 16, 2011. (R. at 30–73). On January 26, 2012, the ALJ issued an opinion finding that Lobbes was not disabled and that she therefore was ineligible for benefits. (R. at 12–25). On March 28, 2013, the Appeals Council denied Lobbes's request for review. (R. at 3–6). This Court has

jurisdiction to review the ALJ's decision as the Administration's final decision on Lobbes's applications. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.955(a), 404.981.

**B. Lobbes's Conditions and Work History**

Lobbes is a 56-year-old woman whose records depict long-standing struggles with bipolar disorder, anxiety, social phobias, an eating disorder, and drug and alcohol abuse. Lobbes holds an associate's degree in civil engineering and a bachelor's degree in recreation. (R. at 197, 395). She owned and operated a kennel from 1994 until 2000, and she worked as a factory machinist from 2003 until 2005. (R. at 198). Since then, Lobbes has worked a variety of jobs but has not kept any for longer than six months. (*Id.*) Most recently, Lobbes maintained the stalls and grounds at a horse camp from April until October of 2009. (R. at 40, 198).

The Record suggests Lobbes's symptoms and treatment were sporadic from 2005 until her claim reached the ALJ in 2011.[1] Healthcare providers' assessments of Lobbes's functionality fluctuated appreciably from week to week, and their global assessment of functioning ("GAF") scores rose as high as 70 and fell as low as 9. Lobbes appears to have engaged in sporadic treatment prior to 2009 but sought aid consistently and from multiple sources in 2009 and 2010. The Record suggests that Lobbes has achieved some success in managing her conditions with medication, but this success also has been inconsistent as she has struggled with side effects and ever-changing dosages.

---

[1] Lobbes has distilled the Record into a thorough chronicle of her conditions, her treatment, and her employment during this period. (*See* Dkt. 15 at 4–15).

Lobbes attributes her inability to remain employed to these conditions and her difficulties in coping with them.

### C. Lobbes's Burden of Proof and the ALJ's Five-Step Inquiry

In order to qualify for benefits, Lobbes must establish that she suffered from a disability as defined by the Social Security Act. A disability is an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To establish a disability, a claimant must present medical evidence of an impairment resulting "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908.

An ALJ must perform a sequential, five-step inquiry to determine whether a claimant is disabled:

(1) Was the claimant unemployed at the time of the hearing?

(2) Does the claimant suffer from a severe impairment or combination of impairments?

(3) Are any of the claimant's impairments—individually or combined—so severe that the Social Security regulations have listed them as necessarily precluding the claimant from engaging in substantial gainful activity?

(4) Does the claimant lack residual functional capacity ("RFC") to perform his past relevant work?

(5) Does the claimant lack RFC to perform any other work existing in significant numbers in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4). *See also* 20 C.F.R. § 404, Subp't P, App'x 1.

The claimant is disabled only if the ALJ answers "yes" to all five questions. *See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). An answer of "no" to any question ends the inquiry immediately and precludes the claimant from eligibility for benefits. *Id.* The claimant bears the burden of proof at Steps One through Four. *Id.* If the claimant succeeds, the Commissioner bears the burden at Step Five of proving that the claimant is not disabled. *Id.*

**D. The ALJ's Findings**

At Step One, the ALJ found that Lobbes had not engaged in substantial gainful activity since her alleged onset date. (R. at 15). At Step Two, the ALJ found that Lobbes was severely impaired by bipolar disorder, a social phobia, and episodic polysubstance abuse. (*Id.*). At Step Three, the ALJ found that none of Lobbes's impairments—individually or combined—met or medically equaled the severity of a listed impairment. (R. at 15). The ALJ specifically considered Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.09 (Substance Addiction Disorders). (*Id.*) *See also* 20 C.F.R. § 404, Subp't P, App'x 1. The ALJ found that Lobbes's impairments mildly limited her activities of daily living; moderately limited her social functioning and concentration, persistence, and pace; and caused no prolonged episodes of decompensation. (R. at 15–17).

Before proceeding to Step Four, the ALJ found that Lobbes retained RFC necessary

> to perform a full range of work at all exertional levels. She can understand, remember, and perform simple work tasks in the range of 1 to 3 steps. She can perform work that does not require any contact with the general public. She can have frequent inconsequential or minimal interaction with coworkers and supervisors (exclude work that requires meeting about or planning for work assignments and tasks). She can perform work that does not require travel to different work sites. Not including the typical morning, lunch, and afternoon breaks, she can perform productive work tasks for an average of 95 percent of an 8-hour workday.

(R. at 17). In reaching this conclusion, the ALJ discussed Lobbes's testimony; the opinions of treating, examining, and consultative sources; three global assessments of functioning ("GAF") by medical sources; Lobbes's treatment and employment histories; and her day-to-day activities. (R. at 17–22).

Based on the hearing testimony of a vocational expert ("VE"), the ALJ found at Step Four that Lobbes's RFC would enable her to perform her old job at the horse camp. (R. at 22). Proceeding to Step Five, the ALJ found that Lobbes's RFC also would allow her to work as commercial cleaner, laundry worker, or apparel sorter and that each job existed in significant numbers in the national economy. (R. at 23–24).

## II.  Standard of Review

The Court must affirm the ALJ's decision unless it is unsupported by substantial evidence or based on a legal error. *E.g., Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal

quotation omitted); *see also Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). The ALJ—not the Court—is charged with weighing the evidence, resolving material conflicts, making independent findings of fact, and deciding questions of credibility. *Richardson,* 402 U.S. at 399–400. Accordingly, the Court may not re-evaluate facts, reweigh evidence, or substitute its judgment for the ALJ's. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). If a conclusion different from the ALJ's also is supported by substantial evidence— or even by more or better evidence—the Court nevertheless must affirm the ALJ's decision so long as it is supported by substantial evidence and not based on a legal error. *See Arkansas v. Oklahoma*, 503 U.S. 91, 112–13 (1992); *Farrell v. Sullivan*, 878 F. 2d 985, 990 (7th Cir. 1989).

### III.    **Analysis**

Lobbes argues that the ALJ's decision was based on five separate legal errors, each stemming from the ALJ's RFC determination preceding Step Four. The Magistrate Judge finds that the ALJ's opinion constitutes error on four of these issues and warrants instruction for additional proceedings on the fifth.

### A. The ALJ erred by examining three GAF scores but ignoring eight others.

Lobbes first argues that the ALJ erred by examining three of the eleven GAF scores in the Record but ignoring the rest. In determining Lobbes's RFC, the ALJ wrote:

> The claimant's global assessment of functioning has been assessed several times. She was assessed with a GAF of 60 in September 2010 while she was participating in cognitive therapy. It increased to 70 after a short self-admission to Bloomington Hospital during a

period of polysubstance abuse. The consultative examiner assigned the claimant a GAF of 49. However, this was based upon a single assessment with the claimant, and the GAF denoted by her treating therapist is more consistent with the record as a whole.

(R. at 19–20 (internal citations and footnotes omitted)). Lobbes claims that, by analyzing three scores and ignoring eight[2] others, the ALJ impermissibly ignored a line of evidence that contradicted his conclusion. (Dkt. 15 at 17–20).

### 1. GAF scores may, but do not always, reflect a clinician's judgment as to the claimant's level of functioning.

As the ALJ noted (R. at 19 n.2), clinicians use GAF to communicate a patient's overall level of functioning through a single number on a scale from 0–100. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000) (*DSM-IV-TR*). A GAF score is not a precisely-calculated metric but a reflection of the clinician's judgment. *Id.* A clinician determines a patient's level of overall functioning by considering the severity of his symptoms and his level of psychological, social, and occupational functioning. *Id.* The clinician assigns a figure to each, and the patient's GAF score is the lower of the two figures. *Id.* at 32–33.

The GAF scale is divided into ten-point ranges. *Id.* at 34. A clinician rates a patient with a specific number indicating functional level within the operative range. *Id.* For example, a score of 38 suggests a comparatively high level of overall functioning within the 31–40 range.

---

[2] The Magistrate notes that Lobbes has identified only five omitted scores. (*See* Dkt. 15 at 18). The Magistrate perceives no substantive or strategic reason why Lobbes would not reference the three remaining scores and infers that they were casualties of a Record approaching 650 pages.

A score between 61 and 70 indicates that the patient is experiencing "[s]ome mild symptoms," "some difficulty in social, occupational, or school functioning," or both. *Id.* A patient functioning in this range is "generally functioning pretty well." *Id.* A score between 51 and 60 indicates that the patient is experiencing "[s]ome moderate symptoms," "moderate difficulty in social, occupational, or school functioning," or both. *Id.*

A score between 41 and 50 indicates that the patient is experiencing "[s]erious symptoms," "serious impairment in social, occupational, or school functioning," or both. *Id.* Notably, a functional level of 50 or lower may imply inability to keep a job. *Id.* A score between one and ten indicates that the patient is experiencing "[p]ersistent danger of severely hurting self or others," "persistent inability to maintain minimum personal hygiene," a "serious suicidal act with clear expectation of death," or all three. *Id.*

### 2. An ALJ errs by ignoring evidence that would undermine his conclusion.

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that supports a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). When the ALJ fails to address evidence favoring the claimant, a reviewing court cannot verify that the ALJ considered all the relevant evidence, understand his reasoning, or measure the substantiality of the evidence supporting his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888–89 (7th Cir. 2001). Therefore, "[a]lthough a written evaluation of each piece of

evidence or testimony is not required . . . neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

### 3. The Record includes eleven GAF scores, but the ALJ addressed only three.

The Record includes eleven separate evaluations of Lobbes's GAF. However, the ALJ acknowledged only three, citing scores of:

- 49, assessed by Dr. Karl Evans, Psy.D., on June 7, 2010 (R. at 395–98);

- 70, assessed by Dr. Carey Mayer, M.D., on September 2, 2010 (R. at 421); and

- 60, assessed by Abbi Powell, L.M.H.C., on September 7, 2010 (R. at 534–44).

(*See* R. at 19–20).

Dr. Evans was a consultative examiner who examined Lobbes at the Administration's request. (*See* R. at 19). Dr. Mayer was the attending physician who oversaw Lobbes's treatment at Bloomington Hospital in August and September of 2010. (*See generally* R. at 419–531). Ms. Powell was a mental health counselor who performed a single evaluation of Lobbes on referral from Dr. Mayer five days after her discharge from the hospital. (R. at 534).

The ALJ was silent as to Lobbes's eight remaining GAF scores of:

- 50, assessed by Debra Garrett, M.S., on October 7, 2004 (R. at 313–15);

- 55, assessed by Ms. Garrett on January 6, 2005 (R. at 312);

- 51, assessed by Dr. Brenda Smith, Psy.D., on June 14, 2005 (R. at 308–311);

- 52, assessed by Rebecca Alexander, L.C.S.W., on November 12, 2009 (R. at 372–81);

- 48, assessed by Ms. Alexander on February 12, 2010 (R. at 368–71);

- 55, assessed by Nidavanh Klopfenstein, C.N.S., on February 24, 2010 (R. at 382–83);

- 55, assessed by Dr. Stacia Hill, Ph.D., on June 8, 2010 (R. at 413–15); and

- 9, assessed by Dr. Joel H. Griffith, M.D., on August 29, 2010 (R. at 422–24).

Ms. Garrett was Lobbes's "primary therapist" at least from October of 2004 until January of 2005. (R. at 312–15). Dr. Smith appears to have treated Lobbes for as little as one week in June of 2005. (R. at 308–11). Ms. Alexander treated Lobbes as a psychological therapist at least from November of 2009 until June of 2010. (R. at 367–81, 382, 532–33). Nurse Klopfenstein treated Lobbes at least from December of 2006 until August of 2007 and again in February of 2010. (R. at 382–85). Dr. Hill, a state agency psychologist, reviewed Lobbes's records in June of 2010. (R. at 399–416). Dr. Griffith examined Lobbes upon her voluntary admission to Bloomington Hospital. (R. at 422–24).

### 4. The ALJ erred by examining some of Lobbes's GAF scores but ignoring others.

By making GAF scores part of his RFC analysis, the ALJ obligated himself to evaluate all the GAF scores in the Record. He did not, and his selective evaluation of Lobbes's GAF scores constitutes error.

### a. By choosing to consider GAF as evidence of Lobbes's RFC, the ALJ bound himself to consider every GAF score in the Record.

Magistrate Judge notes—as did the ALJ (*see* R. at 19 n.2)—that the ALJ was not obligated to rely on <u>any</u> of Lobbes's GAF scores. *E.g.*, *Denton*, 596 F.3d at 425. Although they may be useful for clinicians planning treatments, GAF scores are less valuable to administrative reviewers determining whether a claimant is disabled. *Id.* The GAF reflects a clinician's judgment—not a clinically tested measurement. *DSM-IV-TR* at 32. Moreover, because a GAF score rates two variables with a single number, a reviewer cannot know whether it reflects the clinician's opinion of the claimant's functional level, the severity of her symptoms, or both. *Denton*, 596 F.3d at 425. In fact, the American Psychological Association recently discontinued its endorsement of the GAF, citing "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (*DSM-5*).

Even so, the ALJ consciously figured three GAF scores into his RFC determination. (R. at 19). Consciously or not, he disregarded eight others. (R. at 310, 312, 315, 368, 374, 383, 415, 424). In the end, the ALJ discussed scores of 70, 60, and 49 and neglected scores of 55, 55, 55, 52, 51, 50, 48, and 9. This does not prove that the ALJ intentionally cited evidence showing non-disability and ignored the rest. However, it precludes the Magistrate from concluding that the ALJ fulfilled his duties to address the evidence

contradicting his conclusion and demonstrate that he considered the entire Record. *See, e.g.*, *Zurawski*, 245 F.3d at 888–89.

### b. The ALJ's review of Lobbes's GAF scores was either incomplete or unreasoned.

The ALJ's opinion suggests that he considered only the three GAF he explicitly mentioned, that he failed to find the remaining evaluations in the Record, or both. For example, the ALJ explained in his opinion the GAF scales "pertinent to this decision." (R. at 19 n.2). His omission of the 1–10 range (*see id.*) conveys that he never considered Lobbes's score of 9 upon self-admission to Bloomington Hospital (*see* R. at 424). The ALJ also remarked that Lobbes received a GAF score of 60 in September of 2010 and that it "increased to 70 after a short self-admission to Bloomington Hospital." (R. at 19). In fact, Dr. Mayer's score of 70 <u>preceded</u> Ms. Powell's score of 60. (*Compare* R. at 421 *to* R. at 534–44). Lobbes's GAF score increased to 70 from <u>9</u> and then <u>regressed</u> to 60 within a week. (*See* R. at 422–4).

The ALJ's weighing of the GAF scores also suggests a misapprehension of the Record. He appears to have assigned the greatest weight to the score of 60 Ms. Powell issued shortly after Lobbes was discharged from the hospital. (R. at 19–20, 534–44). The ALJ explained that, as Lobbes's "treating therapist," Ms. Powell merited greater weight than Dr. Evans, who assigned a GAF score of 49 after a single, consultative examination. (R. at 19–20). In fact, Ms. Powell did not "treat" Lobbes over a period of time but evaluated her on a single occasion—just like Dr. Evans. (R. at 534–44). Meanwhile, the ALJ completely

neglected the scores assessed by Ms. Alexander or Nurse Klopfenstein, each of whom treated Lobbes over a period of several months. (R. at 367–85). The ALJ's discussion of GAF necessarily fell short of his duty to consider all the relevant evidence, his obligation to logically connect his conclusion to the evidence, or both.

### c. The ALJ's omissions were material.

Lacking an explanation to the contrary from the ALJ, the Magistrate must conclude that the scores the ALJ ignored were significant. All eight were lower than the score the ALJ accorded the most weight. They were eight of the nine lowest scores in the Record. The Record includes four scores of 50 or lower (R. at 315, 368, 398, 424), each of which suggests that Lobbes may have been unable to keep a job. *See DSM-IV-TR* at 34. The ALJ referenced only one of those four scores. (R. at 19). In contrast, the Record features only one score higher than 61 (R. at 421), which suggests that Lobbes was "generally functioning pretty well." *See DSM-IV-TR* at 34. The ALJ explicitly mentioned this score. (R. at 19).

The ALJ offered no commentary on eight comparatively low GAF scores. The Magistrate cannot conclude with confidence that the ALJ would have reached the same decision if he had considered the entire Record.

### d. The Record and controlling law bar the Commissioner's defenses on this issue.

The Magistrate must reject the Commissioner's argument that the ALJ's opinion actually accounted for all of Lobbes's GAF scores. The ALJ did note that Lobbes's GAF had been recorded "several times." (R. at 19). But, he did

not—as the Commissioner suggests—note that her scores "had generally ranged from 49 through 70." (Dkt. 22 at 8). Indeed, the ALJ did not mention any "range" of scores. He simply identified 3 of the 11 scores in the Record. (*See* R. at 19). More importantly, characterizing Lobbes's scores as ranging from 49 to 70 is inaccurate at best. Lobbes's highest score was 70, but the Record also includes scores of 48 and 9. Even the language the Commissioner falsely attributes to the ALJ demonstrates an incomplete review of the evidence.

The Magistrate also must reject the Commissioner's argument that the ALJ was entitled to disregard Dr. Griffith's score of nine because "that was when she was admitted to the hospital after drinking wood grain alcohol and 'huffing' spray paint." (*See* Dkt. 22 at 9). The Court cannot credit an argument on judicial review that the ALJ did not assert in his opinion. *E.g.*, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)). Therefore, the Court cannot entertain the Commissioner's argument as to what weight should be accorded to Dr. Griffith's GAF after the ALJ failed to accord it any attention at all. (*See* R. at 19).

*Chenery* aside, the Commissioner's argument only illuminates the ALJ's error. Had the ALJ assigned lesser weight to Dr. Griffith's GAF and explained that he thought it was an outlier, the Court would be forced to accept that appraisal. *Butera*, 173 F.3d at 1055. But the ALJ's silence as to Dr. Griffith's score precludes the Court from knowing whether the ALJ actually found Dr. Griffith's GAF aberrational or just failed to consider it. The ALJ's silence

forecloses an understanding of how he could find Lobbes's GAF upon admission to the hospital less aberrational than her score at discharge, which the ALJ cited even though it followed a period of focused and systematic treatment. The ALJ's silence deprives the Court of any insight into his facially incongruous findings that Lobbes is severely impaired by episodic polysubstance abuse and that a polysubstance binge was an aberration. (*See* R. at 15).

The Commissioner's argument would have been helpful had the ALJ articulated it and supported it. Because the ALJ ignored the score all together, the Court cannot be confident that he reviewed all the evidence or grounded his conclusion in solid reasoning.

By finding error on this issue, the Magistrate Judge does not suggest that the GAF scores the ALJ neglected are entitled to greater weight than those he cited. The ALJ—not the Court—is charged with weighing the evidence. *Richardson,* 402 U.S. at 399–400. The ALJ may have substantial reasons for weighing the scores of 70, 60, or 49 more heavily than the scores of 55, 55, 55, 52, 51, 50, 48, or 9. But, he at least must acknowledge those eight scores and explain why they figure less prominently in his decision than the three he credited.

The Magistrate is not asking the ALJ to reweigh the evidence. The Magistrate is asking the ALJ to weigh all the evidence.

The Magistrate acknowledges that three of the omitted scores preceded Lobbes's alleged onset date but finds no reason to treat them differently at this

stage. The Social Security Act binds the Commissioner to "consider all evidence available in [the claimant]'s case record" and makes no exceptions based on the alleged onset date. *See* 42 U.S.C. § 423(d)(5)(B). As with the other scores in the Record, the ALJ may be justified in according them little weight, but he must review them and explain his reasons.

In sum, the Magistrate finds that, when the ALJ embraced GAF scores as evidence of Lobbes's RFC, he became obligated to address all of Lobbes's GAF scores. By ignoring eight comparatively low scores, the ALJ erred as a matter of law. The Magistrate therefore recommends that the Court **REMAND** this action with instructions to reassess Lobbes's RFC while either accounting for all of her GAF scores or considering none at all.

### B. The ALJ failed to account for Lobbes's differences in productivity during manic and depressive phases when he framed his hypothetical questions to the VE.

At Step Three, the ALJ noted that, as a consequence of her bipolar disorder, Lobbes "functions well when she is in a manic phase. She creates baskets, jams, jellies, and other crafts. However, when she is in a depressive phase, she is less productive." (R. at 15–16). Lobbes concurs with this finding, but she alleges that the ALJ twice failed to apply the limitations imposed by her depressive phases. The Magistrate Judge finds that the ALJ adequately accounted for Lobbes's depressive symptoms when he determined her RFC but erred by failing to account for them when he presented a series of hypothetical questions to the VE.

### 1. The ALJ adequately considered the differences between Lobbes's manic and depressive phases when determining her RFC.

Lobbes contends that the ALJ erred by failing to consider her diminished productivity during depressive phases when he formulated her RFC. (*See* Dkt. 15 at 20–22. Precedents from the Seventh Circuit teach that an ALJ errs by failing to consider the impact of depressive phases—and the complexity of treating them—when determining whether a person experiencing bipolar disorder is disabled. The Court of Appeals has recognized that bipolar disorder is episodic, characterized by alternating periods of mania and depression. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). People experiencing bipolar disorder can stabilize their moods through therapy and medication— sometimes well enough to work. *Id.* at 630–31. The Court of Appeals also has noted, however, that people experiencing bipolar disorder routinely struggle to take their medications consistently. They typically are prescribed in heavy doses and carry burdensome side effects. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). Moreover, the episodic nature of the condition—particularly during manic phases—inherently compromises a person's ability to medicate consistently. *See id.*; *see also Kangail*, 454 F.3d at 629, 630–31. Consequently, even people who achieve consistent treatment and symptom management commonly suffer relapses and recurrences. *See Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008).

For those reasons, the Seventh Circuit has held that ALJs err when they fail to consider that people experiencing bipolar disorder often are incapable of

taking their medicine consistently. *Martinez*, 630 F.3d at 697; *Kangail*, 454 F.3d at 630–31. ALJs also must consider that even claimants who take their medication consistently will experience "better days and worse days." *Bauer*, 532 F.3d at 608–09. Finally, ALJs must consider the frequency with which claimants experience worse days. *Id.* at 609. In the context of bipolar disorder, worse days typically do not allow for productive employment, and a person who experiences worse days regularly will not realistically be able to work eight hours per day, five days per week, week after week. *Id.*

The Magistrate Judge finds that the ALJ's explanation of his RFC determination reflects sufficient consideration of the symptoms, frequency, and duration of Lobbes's depressive phases. Reviewing the state agency psychologist's report, the ALJ noted that Lobbes "reported depressive symptoms, including insomnia, excessive sleep, lack of appetite, hopelessness, and feelings [sic] worthless at the consultative examination." (R. at 19 (internal citations omitted)). The ALJ further noted that Lobbes "testified that her manic phases last about two weeks, and her depressive phases last approximately two weeks." (R. at 20).

The ALJ also addressed Lobbes's abilities to take her medications regularly and to work consistently despite her symptoms. The ALJ cited an evaluation remarking that one of Lobbes's strengths was "taking medications as prescribed." (R. at 19). He noted that, despite struggling with some side effects, Lobbes reported success in controlling her mood swings with medication. (R. at 20 (citing R. at 367)). He also noted that, although she

reports having experienced symptoms of bipolar disorder for roughly 40 years, Lobbes has managed those symptoms well enough to graduate high school and college and work in a variety of fields. (R. at 20).

Therefore, the Magistrate Judge cannot agree with Lobbes's argument that "[i]t is not possible to know for sure whether the ALJ's residual functional capacity assessment refers to Lobbes's abilities and limitations during a manic phase or during a depressive phase." (Dkt. 15 at 24). The Magistrate instead finds that the ALJ contemplated Lobbes's abilities and limitations during both manic and depressive phases and ultimately concluded that they did not negatively affect her RFC so much as to merit a finding of disability. This conclusion is consistent with the ALJ's findings at Step Three that her depressive symptoms only mildly restrict her activities of daily living and moderately restrict her concentration, persistence, and pace. (*See* R. at 15–16). Accordingly, the Magistrate recommends that the Court **AFFIRM** the ALJ's RFC determination as adequately reflecting the frequency and severity of Lobbes's depressive symptoms.

### 2. The ALJ erred by failing to account for Lobbes's depressive phases when framing his hypothetical questions to the VE.

Lobbes also argues that the ALJ erred by failing to reference Lobbes's depressive phases and symptoms when he presented a series of hypothetical questions to the VE. To determine Lobbes's employability at Steps Four and Five, the ALJ consulted a VE at her hearing. (R. at 22–24). The ALJ solicited the VE's testimony by presenting a series of five hypothetical questions. (R. at

64–67). The questions were cumulative, each building on the facts underlying the questions before it. (*Id.*).

Framing his hypothetical questions, the ALJ made no explicit reference to Lobbes's depressive phases or the limitations they imposed on her productivity and activities of daily living. The ALJ did direct the VE to consider a series of other limitations consistent with his RFC determination, including:

- "moderate limitations in concentration, persistence, and pace" (R. at 64);

- a limitation to performing "simple work tasks in a range of one to three steps" (*id.*);

- a limitation to "frequent, inconsequential, or minimal interaction with coworkers and supervisors" (R. at 65);

- inability to "travel to different work sites" (*id.*);

- inability to operate a motor vehicle (R. at 65–66);

- a limitation to work "that does not require any contact with the general public" (R. at 66); and

- ability to work productively for up to 95% of an eight-hour workday (R. at 66–67).

(*Compare to* R. at 17). In response to an additional question from the ALJ, the VE testified that Lobbes would be unable to keep any job if she was only able to work productively for up to 90% of an eight-hour workday. (R. at 67). In response to a question from Lobbes's attorney, the VE testified that Lobbes would be unable to keep any job if she missed an average of two days of work per month due to being upset after receiving instruction or criticism from a supervisor. (R. at 67–69).

The VE was present for all testimony at Lobbes's hearing and testified that he reviewed beforehand the portions of the Record concerning her past relevant work. (*See* R. at 34 , 63–64). However, the VE also testified that—in answering the ALJ's questions—he considered only the hypothetical facts the ALJ presented. (R. at 71). Based on the VE's answers, the ALJ concluded that Lobbes was capable of working as a livestock yard attendant, a commercial cleaner, a laundry worker, or an apparel sorter. (R. at 23–24).

### a. The ALJ obligated himself to orient the VE to all of Lobbes's limitations.

"If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The Court of Appeals has applied this requirement to limitations affecting claimants' activities of daily living, *see Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), and concentration, persistence, and pace, *see, e.g.*, *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011). "The reason for [this] rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele*, 290 F.3d at 942.

The ALJ was obligated to incorporate the limitations imposed by Lobbes's depressive phases when he questioned the VE. The ALJ leaned heavily on the VE's testimony in his opinion. (*See* R. at 22–24). And, Lobbes's depressive phases present a limitation supported by medical evidence in the Record. The

ALJ himself found that Lobbes's depressive phases limit her productivity. (R. at 15–16). The ALJ also found that Lobbes's bipolar disorder—the impairment causing the limitation—was "established by the medical evidence." (R. at 15). Indeed, the ALJ credited several sources and pieces of evidence (identified below in Table 1) supporting the conclusion that Lobbes is impaired by bipolar disorder, which includes depressive phases limiting productivity. *See Kangail*, 454 F.3d at 629–31.

| Table 1: ALJ's Citations of Evidence Addressing Lobbes's Depressive Phases | | |
|---|---|---|
| Evidence & Source | Location in Record | Citations by ALJ |
| Evaluation by Dr. Karl Evans (Consultative Examiner) | 395, 398 | 19, 21 (assigning probative weight) |
| Evaluation by Dr. Stacia Hill (State Agency Examiner) | 402 | 19, 21–22 (assigning probative weight) |
| Discharge Report by Rebecca Alexander, L.C.S.W. (Treating Therapist) | 532 | 19 |
| Evaluation by Abbi Powell, L.M.H.C. | 537 | 19–20 |
| Evaluations by Dr. Yvonne Asiimwe (Treating Physician) | 618, 640, 644, 647 | 21 (assigning probative weight) |

### b. The ALJ failed to orient the VE to Lobbes's diminished productivity during depressive phases.

The ALJ did not adequately address Lobbes's depression-induced limitations in productivity when he framed his questions to the ALJ. The ALJ instructed the VE to consider a hypothetical with specific characteristics, and those characteristics only addressed Lobbes's limitations in social functioning and concentration, persistence, and pace. (R. at 64–67). Moreover, the ALJ did not instruct the VE to consider, for example, "a hypothetical person with the claimant's impairments" or some other generic and implicit instruction to

consider all of Lobbes's limitations. The ALJ limited the VE's attention to the limitations he listed, and he did not list a limitation caused by bipolar disorder's depressive symptoms.

An ALJ's failure to reference a limitation in his hypothetical questions does not <u>automatically</u> constitute error. An ALJ does not err by omitting a limitation that he has not found credible. *E.g.*, *Jelinek*, 662 F.3d 805. Nor does an ALJ err by failing to reference a limitation if the Record demonstrates that the VE learned of the limitation independently (for example, by reviewing the Record or observing hearing testimony) <u>and</u> considered the limitation in answering the hypotheticals. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *see also Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). However, this exception does not apply where the ALJ has directed the VE to consider a specific set of facts in answering his hypothetical questions and the Record indicates that the VE has considered only those facts. *Young*, 362 F.3d at 1003.

The ALJ's instructions to the VE fell beyond the scope of both exceptions. The ALJ did not find that the evidence of limited productivity lacked credibility. *See, e.g.*, *Jelinek*, 662 F.3d 805. Again, the ALJ himself found that Lobbes was less productive during her depressive phases. (R. at 15–16). He found Lobbes's allegations and testimony to be partially credible and did not express specific doubt as to the limiting effect of her depressive phases. (R. at 20). And, regardless of whether the VE knew independently of Lobbes's limited productivity during depressive phases, the Record indicates he did not consider

that limitation in answering the ALJ's questions. *Accord. Young*, 362 F.3d at 1003. The VE testified that he considered only the hypothetical facts the ALJ presented, and those facts did not include bipolar depression or its consequent limitations in productivity. (R. at 71).

The ALJ did not err in evaluating Lobbes's RFC. Rather, he fell short of communicating to the VE all the limitations that comprised Lobbes's RFC. Unlike the Court, the VE lacked the benefit of the ALJ's full opinion. The VE was not privileged to testify on the basis of the ALJ's six-page RFC analysis. He could testify only on the basis of the facts presented, and the ALJ presented no facts about Lobbes's depressive symptoms. The ALJ determined Lobbes's employability based on the VE's testimony, and the VE testified based on an incomplete description of Lobbes's RFC.

In sum, the ALJ relied on the VE's answers to his hypothetical questions in determining Lobbes's employability at Steps Four and Five. The ALJ therefore was obligated to orient the VE to the totality of Lobbes's limitations, and he left this obligation unfulfilled when he failed to instruct the VE to consider Lobbes's depressive phases and the diminished productivity that accompanied them. Therefore, the Magistrate Judge recommends that the Court **REMAND** this action to the Commissioner with instructions to disclose all of Lobbes's medically supported limitations to any vocational expert whose testimony will underlie the disability determination.

### C. The ALJ erred in evaluating third-party function reports from Karen Ricketts and Kim Humphries.

Lobbes alleges that the ALJ erred in evaluating third-party function reports submitted by her friend, Karen Ricketts, and her former employer, Kim Humphries. (Dkt. 15 at 22–24). The ALJ devoted only two sentences to these statements:

> The undersigned has also considered evidence provided by other 'non-medical sources' such as spouses, friends, employers, and neighbors. The third party statements of the claimant's friend and former employer are partially credible for the same reasons stated in the above paragraph.

(R. at 21 (internal citations omitted)). Lobbes argues that the ALJ should have evaluated third parties' statements, identified which portions were credible, and explained why the rest lacked credibility. (Dkt. 15 at 22–23).

The Commissioner does not dispute this argument but instead argues that the ALJ satisfied his obligations by finding that Lobbes was productive while medicated. (Dkt. 22 at 10). But, the passage to which the Commissioner refers states only that Lobbes "regularly takes medications for her psychological conditions," that her doctors must regularly adjust her medications and dosages, and that—despite their side effects—she has achieved some stability through medication. (R. at 19–20). Moreover, the ALJ failed to address the contents of either third-party report or connect either report to Lobbes's success with medication.

The Magistrate Judge must reject the Commissioner's justification. Because the ALJ never connected his assessment of Lobbes's medication to his assessment of the third-party reports, the Commissioner may not argue that

the former constitutes an evaluation of the latter. *Steele*, 290 F.3d at 941

(citing *Chenery*., 318 U.S. at 93–95). If the Commissioner's argument withstood

*Chenery*, it could not satisfy the standard Lobbes has advanced and the

Commissioner has accepted. The passage the Commissioner cites does not

include any evaluation of the third-party reports. And, having addressed none

of the reports' contents, it is impossible to know which parts the ALJ found

credible and which he discounted.

The Commissioner has not disputed Lobbes's conception of the ALJ's

obligations. If the ALJ was required to address the reports, identify which parts

were credible, and explain why the rest were not, the Commissioner's argument

must fail. An isolated statement about Lobbes's medication and a perfunctory

acknowledgment that the ALJ reviewed the reports and found them partially

credible hardly satisfy this burden.

The Magistrate also declines to accept Lobbes's argument that the ALJ

erred because it is not clear to which "above paragraph" his opinion refers. (*See*

Dkt. 15 at 23). The Magistrate is confident the ALJ referred to page 20 of the

Record, where he devoted two paragraphs to Lobbes's credibility. The ALJ

explained that he found Lobbes partially credible because her limitations in

performing daily activities "cannot be objectively verified" and "are outweighed

by" contradictory medical evidence and "other factors discussed in this

decision." (R. at 20).

But this reference cannot save the Commissioner. Lobbes has not

challenged the ALJ's assessment of her own credibility. A threadbare reference

to a pro forma assessment of the claimant's credibility does not translate to a thorough analysis and logical explanation of the third parties' credibility. By her silence, the Commissioner has conceded to Lobbes's characterization of the ALJ's responsibility. The ALJ's opinion has not met that standard.

As Lobbes notes, the ALJ's error is material. (Dkt. 15 at 23). For example, Ms. Ricketts shared that Lobbes "can't concentrate on things," "feels intimidated" by authority figures, and "will stay in bed for days at a time." (R. at 173, 175, 176). When asked how well Lobbes handles stress, Ms. Ricketts answered, "<u>NOT AT ALL</u>." (R. at 175 (emphasis in original)). Ms. Humphries shared that, despite her medication, Lobbes "could not keep up with the work load" or show up to work consistently. (R. at 228). She added that Lobbes "has a problem with authority figures," that staff "could not get her to follow direction," and that she represents "a safety risk." (R. at 229–30).

If credible, these statements would undermine the ALJ's findings about Lobbes's ability to maintain full-time employment. The ALJ may have been justified in finding any of them incredible. But, because the ALJ did not address any of the statements, the Court cannot know which of these statements the ALJ found credible or why he found the others lacked credibility.

In sum, the Magistrate finds that the ALJ erred by failing to properly assess the third-party function reports. The Magistrate recommends that the Court **REMAND** the action on this issue with instructions to thoroughly assess the reports and explain their credibility.

**D. The ALJ erred in considering Lobbes's participation in vocational rehabilitation.**

Assessing Lobbes's RFC, the ALJ noted that she "participated in vocational rehabilitation services in 2009. ([R. at 298]). Long term full-time employment was the claimant's goal, illustrating the claimant did not view herself as having severe functional limitations." (R. at 20).

Lobbes argues that this commentary amounts to legal error for two reasons. (Dkt. 15 at 15–17). First, Lobbes participated in vocational rehabilitation before her alleged onset date in 2006—not 2009. (*Id.* at 16). Because this treatment preceded her alleged onset date, Lobbes submits that the ALJ was not privileged to consider it in determining Lobbes's RFC. (*Id.*). Second, Lobbes explains that the Social Security regulations do not regard vocational rehabilitation as evidence of non-disability but, rather, encourage people who are disabled to engage in vocational rehabilitation as a form of treatment. (*Id.* at 16–17). The Commissioner concedes on both grounds but contends that the ALJ's error was harmless because his "evaluation of the evidence was otherwise reasonable." (Dkt. 22 at 7).

Even where the ALJ has based his decision on a legal error, the Court may not remand the action if the error was harmless. *MicKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). But the harmless error standard does not allow the ALJ's decision to stand just because it is otherwise supported by substantial evidence. *E.g.*, *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Substantial-evidence review ensures that the Administration has fulfilled its

statutory duty to "articulate reasoned grounds of decision based on legislative policy and administrative regulation." *Spiva*, 628 F.3d at 353. By contrast, harmless-error review "ensure[s] that the first-line tribunal is not making serious mistakes or omissions." *Walters v. Astrue*, 444 Fed. App'x 913, 919 (7th Cir. 2011) (non-precedential order) (citing *Spiva*, 628 F.3d at 353). Therefore, an error is harmless only if the Court determines—"with great confidence"— that remand would be pointless because no reasonable trier of fact could reach a conclusion different from the ALJ's. *McKinzey*, 641 F.3d at 892; *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

The Magistrate Judge cannot accept that the ALJ's error was harmless because his "evaluation of the evidence was otherwise reasonable." (*See* Dkt. 22 at 7–8). The Court of Appeals has stated unambiguously that the support of substantial evidence is not enough to salvage a legally erroneous opinion from remand, *Spiva*, 628 F.3d at 353, and the Magistrate cannot conclude with any confidence that the ALJ would have reached the same conclusion had he not considered Lobbes's participation in vocational rehabilitation. At the very least, the ALJ found this evidence important enough to merit specific attention in the opinion. Ultimately, the ALJ concluded that Lobbes's impairments "impose psychological limitations, but not to the extent that they substantially interfere with her capacity to perform basic work tasks on a sustained basis." (R. at 22). Underlying this conclusion—at least in part—were the ALJ's understanding that Lobbes was participating in vocational rehabilitation and his attendant impressions that she was committed to achieving full-time employment and did

not perceive herself as limited. (R. at 20). The Magistrate cannot conclude with confidence that a different understanding would not produce a different finding.

Nor can the Magistrate accept that the evidence so overwhelmingly supports the ALJ's RFC determination that no reasonable ALJ could reach a different conclusion. On substantial-evidence review, the Court may not reweigh the evidence. *Butera v. Apfel*, 173 F.3d at 1055. On harmless-error review, however, the Magistrate must acknowledge that numerous, substantial facts in the Record would support a conclusion that Lobbes lacked RFC to maintain full-time employment. The Magistrate already has discussed, for example, GAF scores and third-party reports that could support a reasonable conclusion that Lobbes was disabled. The Record is not so lopsided as to preclude a reasonable person from finding that Lobbes's RFC was less than the ALJ determined.

The Magistrate therefore finds that the ALJ's errant reliance on Lobbes's participation in vocational rehabilitation was not harmless and recommends **REMANDING** Lobbes's cause on this count. Should the Court disagree but remand on any other ground, the Magistrate notes that the Commissioner has conceded that the ALJ erred and therefore acknowledges that the Administration may not consider vocational rehabilitation on remand.

### E. The ALJ did not err in finding that Lobbes retained RFC to remain on task for an average of 95% of an 8-hour workday, but the ALJ's failure to explain that finding may warrant remand.

The ALJ found at Steps Two and Three that Lobbes was moderately limited in her ability to maintain concentration, persistence, and pace. (R. at 15, 16). At the administrative hearing, the ALJ asked the VE to testify to the employability of hypothetical workers who could remain on task for, respectively, 95% and 90% of a workday. (R. at 66–67). The VE testified that, whereas the former could work a variety of jobs, the latter would be unemployable. (R. at 67). The ALJ found Lobbes retained RFC to "perform productive work tasks for an average of 95 percent of an 8-hour workday" and could work the jobs the VE identified. (R. at 17, 22–24).

Lobbes argues that the ALJ's findings—that her concentration, persistence, and pace are limited but that she can remain on task for an average of 95% of an 8-hour workday—are incompatible. (Dkt. 15 at 26). By adopting the 5% reduction in on-task time, Lobbes contends, the ALJ failed to account properly for her limited concentration, persistence, and pace. (*Id.* at 25).

#### 1. The ALJ properly accounted for Lobbes's moderate limitation through reductions in both task complexity and productivity.

At the outset, the Magistrate questions Lobbes's reading of the ALJ's opinion. Lobbes's argument relies on the premise that the ALJ accounted for Lobbes's limited concentration, persistence, and pace <u>only</u> by reducing her on-task time by five percent. The ALJ's RFC determination and instructions to the

VE void this premise. Both communicated that Lobbes could only "understand, remember, and perform simple work tasks in the range of 1 to 3 steps." (R. at 17, 64). The ALJ explicitly explained that he accounted for Lobbes's limited concentration, persistence, and pace by including these "reductions in task complexity." (R. at 22, 64[3]).

The notion that a limitation in concentration, persistence, and pace may manifest itself through either a diminished ability to remain on task or an inability to perform certain types of jobs has received support in our Circuit. *See Seamon v. Astrue*, No. 07-cv-0588-bbc, 2008 WL 3925829 at *12 (W.D. Wis. Aug. 19, 2008). The Magistrate endorses this approach and finds no reason to hold that the ALJ erred by concluding that Lobbes's limited concentration, persistence, and pace represent an ability to complete only simple tasks and an ability to remain on task for (on average) 95% of the time.

### 2. Equating a moderate limitation to a five percent reduction in functionality does not necessarily constitute legal error.

If the ALJ had accounted for Lobbes's limitation only through an on-task reduction, the Magistrate Judge still would be reluctant to hold that the ALJ erred by quantifying that reduction at 5%. Such a holding would mean that a

---

[3] This conclusion is partially muddied by what the Magistrate perceives is a misplaced semicolon in the hearing transcript. The Magistrate reads the ALJ's dialogue as stating, "The hypothetical person can perform work at all exertional levels[.] [D]ue to moderate limitations in concentration, persistence, and pace[,] [she] can understand, remember, and perform simple work tasks in a range of one to three steps . . . ." (R. at 64). The alternative reading—that Lobbes's <u>limitations</u> in concentration, persistence, and pace <u>enable</u> her to perform work at all exertional levels—lacks all sensibility.

moderate limitation in concentration, persistence, and pace equates—as a matter of law—to more than a 5% reduction in productivity. The Magistrate finds no competent authority to support such a rule and is persuaded by authority to the contrary.

The Social Security Regulations require ALJs to rate the degree of functional limitation caused by a claimant's mental impairments at one of five severities: none, mild, moderate, marked, or extreme. 20 C.F.R. 404.1520A(c)(4). Lobbes concedes that neither Congress, the Social Security Administration, nor any federal appellate court has devised a hard-and-fast scale equating any of the five labels to a numerical reduction in functionality. (Dkt. 15 at 26–27). However, quantifying claimants' limitations has become an important and common component of disability determinations. ALJs routinely depend on testimony from VEs to evaluate employability at Steps Four and Five. Because the severities have no concrete definitions, VEs cannot testify meaningfully without attempting to quantify an impairment's impact on a claimant's productivity. *See Olson v. Astrue*, No. 08 C 0996, 2009 WL 2365511 at *12 (N.D. Ill. Mar. 16, 2009). "Consider a claimant with a mild limitation in social functioning" is an inherently nebulous instruction likely to carry different meanings among different ALJs and VEs. Meanwhile, "Consider a claimant who can remain on task for at least 95% of an eight-hour work day" tells a VE how much of a work week an employer could realistically expect the claimant to be productive. Consequently, ALJs have taken to quantifying

claimants' limitations in their hypothetical questions and requiring claimants' attorneys to follow suit. *See, e.g.*, *id.*

The Magistrate cannot accept Lobbes's argument that equating a moderate limitation to a five percent reduction in functionality constitutes legal error. Lobbes offers six district court decisions from outside our Circuit for the proposition that "a figure of 20 percent less than normal seems to be the most appropriate way to quantify 'moderate.'" (Dkt. 15 at 26–27). The Magistrate finds these authorities unpersuasive. First, in four of the six cases, the figure was advanced by a source other than the district judge. (*Id.*). The Magistrate does not see fit to remand the ALJ's decision because it conflicts with the opinion of a different ALJ or a state agency psychologist in California. (*Id.* (citing, *e.g.*, *Broder v. Comm'r of Soc. Sec.*, No. 10-15162, 2012 WL 529944 at *3 (E.D. Mich. Jan. 24, 2012); *Spencer v. Astrue*, No. CIV S-08-0047EFB, 2010 WL 1286707 at *2 (E.D. Cal. Mar. 29, 2010))). Second, the proper quantification of a moderate limitation was not litigated in any of Lobbes's six cases. Each passage Lobbes cites is dictum, identifying a quantification from the administrative record as a statement of fact never subsequently questioned. Third, Lobbes's contention is directly contradicted by more persuasive authority from our own Circuit finding that an ALJ does not necessarily err by equating moderate limitations to on-task reductions as high as 95%. *See Wennerstein v. Colvin*, No. 12-cv-783-bbc, 2013 WL 4821474 (W.D. Wis. Sep. 10, 2013).

### 3. Whether an ALJ errs in quantifying a claimant's limitations is a matter of evidence and reasoning—not his choice of numbers.

Rather than scrutinizing the ALJ's chosen number, the Magistrate Judge recommends focusing on the process by which the ALJ has quantified the claimant's limitations. In a vacuum, the Magistrate would agree with Lobbes's contention that 95% productivity is a puzzling quantification of a moderate limitation. Absent some clear guideline, though, the Magistrate's choice of a different number would be as arbitrary as the ALJ's choice of 95%. Instead, the Magistrate endorses the holdings of two district judges from our Circuit emphasizing the ALJ's analysis over his taste in numbers.

In *Wennerstein*, our colleague affirmed an ALJ's equation of moderate limitation in concentration, persistence, and pace to a 5% reduction in on-task time because the ALJ explained his equation thoroughly and supported it with substantial evidence. On judicial review, the claimant argued that the ALJ erred because the 5% reduction was both arbitrary and incompatible with his finding of a moderate limitation in concentration, persistence, and pace. *Id.* at *1, *3.

The district judge reproduced some 500 words from the ALJ's opinion describing the evidence and reasoning supporting his findings of a moderate limitation and a 5% reduction in on-task time. *Id.* at *1–2. In light of all that evidence and explanation, the district judge read the ALJ's findings as "a conclusion that any difficulties plaintiff has staying on task are negligible." *Id.* at *2. She added that the percentage an ALJ chooses is not necessarily a

ground for remand. *Id.* at *3. "The important point is that the administrative law judge did not find any evidence to show that plaintiff's ability to stay on task was impaired to the extent that it would keep him from working." *Id.*

In *Brent v. Astrue*, 879 F. Supp. 2d 941 (N.D. Ill. 2012), our colleague found no error in an ALJ's equation of a moderate limitation to a 15% reduction in functionality, but he did find error in the ALJ's failure to explain that equation. In evaluating the claimant's RFC, the ALJ found she experienced a moderate limitation in concentration, persistence, and pace. *Id.* at 853. During the hearing, the ALJ asked the VE to testify to the employability of a hypothetical worker who could "maintain concentration, persistence and pace for, alternatively, sixty percent and eighty-five percent of the workday." *Id.* The VE testified that a worker could not keep a job unless she could maintain concentration, persistence, and pace for at least 80% of a workday. *Id.* In her opinion, the ALJ found the claimant could maintain concentration, persistence, and pace for 85% of the workday. *Id.*

Our colleague found that the ALJ erred by failing to "build a bridge between" his finding of a moderate limitation and his determination that the claimant could maintain concentration, persistence, and pace for 85% of the workday. *Id.* He found this error especially troublesome given the VE's testimony that 80% represented the cut-off line for employability. *Id.* An ALJ, he explained, "must build a logical bridge between the limitations he finds and the VE evidence relied upon to carry the Commissioner's burden . . . ." *Id.* (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).

### 4. The Magistrate questions the ALJ's explanation of Lobbes's ability to remain on task for 95% of a workday.

Though perhaps not erroneous, the ALJ's explanation of Lobbes's ability to remain on task lacks thoroughness. Lobbes's <u>difficulties</u> in maintaining concentration, persistence, and pace are well-documented. (*See* R. at 16). However, the ALJ barely addressed Lobbes's <u>ability</u> to remain on task. In a five-sentence snippet of his RFC determination, the ALJ explained that Lobbes can "persist, focus, and concentrate" during her manic phases and that her depressive phases have not prevented her from concentrating well enough to graduate high school and college and keep a variety of jobs. (R. at 20). If additional evidence supports the ALJ's conclusion, he did not cite it. Nor did the ALJ explain how he translated these facts into a finding that Lobbes could remain on task for an average of 95% of her workdays. *Compare to Wennerstein*, 2013 WL 4821474 at *2 (quoting ALJ's opinion, which explicitly connects the evidence to a 5% reduction in on-task time).

The Magistrate finds the ALJ's thin explanation mitigated by the fact that he accounted for Lobbes's limitations by reducing both her on-task time and the complexity of work she can perform. Nevertheless, the ALJ found that Lobbes could remain on task nearly all the time but devoted at least as much of his opinion to her deficits in this area as he did to her abilities. (*See* R. at 16, 20). The ALJ's opinion in *Wennerstein* may represent a perfect example instead of a passing grade, but the opinion in this case falls well short of it.

The ALJ also failed to explain why he equated the facts to a five percent reduction as opposed to the 10% reduction he contemplated (or, for that matter, any other number). The ALJ's failure to connect his factual findings to his chosen number is particularly disconcerting because, as in *Brent*, the figure he discarded would have meant disability according to the VE's testimony. The opinion explains only that 95% reflects a "[r]easonable accommodation commensurate with the medical evidence" and that 90% is "not supported by the medical evidence." (R. at 22). These bald justifications tempt the reader to wonder whether the ALJ impermissibly based his RFC determination on the VE's testimony.

> **5. The Magistrate recommends that the Court affirm the ALJ's decision on this issue but instruct the Commissioner to more thoroughly explain his quantification of Lobbes's limitation on remand.**

In conclusion, the Magistrate Judge finds that the ALJ was entitled to account for Lobbes's moderate limitation in concentration, persistence, and pace by limiting her to simple tasks and finding she would be off task up to 5% of the average workday. The Magistrate further finds that substantial evidence supports these conclusions, as Lobbes has not argued otherwise. Therefore, the Magistrate recommends that the Court **AFFIRM** the ALJ's opinion on this issue.

However, the Magistrate also finds that the ALJ failed to thoroughly explain why he found Lobbes can remain on task for an average of 95% (as opposed to 90% or any other fraction) of an 8-hour workday. VE testimony has become a critical component of disability determinations, and VEs cannot

testify meaningfully without quantified limitations. Accordingly, the Magistrate finds it imperative that ALJs who rely on testimony from VEs consistently and thoroughly explain the parameters they present them. Should the Court remand this action, whether because it disagrees with the Magistrate's assessment of this issue or because it accepts the Magistrate's recommendation to remand on a different issue, the Magistrate recommends that the Court instruct the Commissioner to more thoroughly explain her quantification of Lobbes's deficiency in remaining on task.

## IV. Conclusion

For the foregoing reasons, the Magistrate Judge finds that the ALJ erred as a matter of law and recommends that the Court **REMAND** this cause for proceedings consistent with this Report.

**SO RECOMMENDED** the 1st day of April, 2014.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Distribution to all ECF-registered counsel of record via email.**